## JOSEPH BRYANT *et al. versus* COMMONWEALTH INSURANCE COMPANY.

131

The owner of goods insured cannot abandon on account of the vessel's being disabled in the course of her voyage, if upon the whole it is reasonable, taking into view the nature of the voyage and the time, expense and risk of sending on the cargo, that the master should procure another vessel for that purpose, although he should not be able to do it at the port of distress or one contiguous, and although it should be necessary to make use of land carriage to reship the goods.

Insurance on coffee, sugar and tea from Havana to Castine in Maine. On the 28th of December the vessel stranded at the Washwoods, on the coast of Virginia, about 40 miles from Norfolk, and the goods were landed without damage. The assured received a letter from the master on the 8th of January, relating the accident, and on the same day an abandonment was tendered but refused. The master, without waiting to hear from the assured, on the 11th of January sold the goods on the beach for 11,544 dollars. The invoice value was about 11,850. The duties paid by the master (5,390 dollars), the wreck master's commissions on the sales (577), and the expense of saving the goods (300), amounted to 6,267 dollars. The goods might have been carried to Norfolk by land in three or four days after the accident, and thence shipped in another vessel to the port of destination, for 3,859 dollars, but the master made no attempt to send them on. It was considered that the loss was not affected by the duties, and it was *held* that the master was not authorized to make the sale and that the assured had no right to abandon, as the expenses of saving the goods and sending them on to the port of destination would have been less than fifty per cent of the invoice value.

A usage for the master of a vessel stranded, to sell the cargo without necessity, is void.

Claims for a general average loss and a total loss may be joined in one count.

Where a policy provided that a loss should be paid in sixty days after proof and adjustment thereof, and the assured gave notice of a total loss more, and of a general average loss less, than sixty days before bringing his action, it was *held* that in respect to the general average loss the action was premature.

ASSUMPSIT on a policy of insurance, dated November 11, 1824, by which the defendants caused the plaintiffs to be insured 9,600 dollars on the cargo, and 400 on the freight, valued at 800, of the schooner William King, at and from Havana to her port of discharge in the United States.

At the trial before *Wilde* J. it appeared in evidence, that the schooner sailed from Havana on the 30th of November, 1824, bound for Castine, having on board 500 bags of coffee, 50 boxes of sugar, and six chests of tea, the whole of which, as well as a part of the vessel, was the property of the plaintiffs. After being several days at sea, she was compelled by stress of weather, the death of the mate and sickness among the crew, to bear away for the port of Charleston for repairs, and for a new crew, where she arrived on the 7th or 8th of December. Certain repairs were there made and a new crew shipped, and to defray the expenses the master sold 40 bags of the coffee for 660 dollars and 80 cents, exclusive of the duties and charges. The schooner sailed from Charleston with the remainder of her cargo, on the 18th or 19th of December, and on the 28th she was cast ashore, by stress of weather, at the Washwoods, on the coast of Virginia, about forty miles from Norfolk. She sustained no material damage by stranding. On the second or third day afterwards all her cargo was landed on the beach, with but little if any damage, where it remained until the 11th of January, 1825, when it was sold, as was the schooner also, by the wreck master, by order of the master of the schooner, for the benefit of the owners, underwriters, and others concerned. The cargo and vessel were advertised for sale in the Norfolk newspapers of the 3d of January. Having completed the sales and received the proceeds, the master went to Norfolk, where he paid the duties on the cargo to the collector of Norfolk, on the 15th of January, amounting to 5,390 dollars. From thence he proceeded to New York, where he had a wife and child. He has ever since, as it is believed, kept himself fraudulently concealed, has not paid the proceeds of the cargo and vessel to either the plaintiffs or the defendants, and neither party has been able to find him. The master and mate on the outward voyage died at Havana, and the master on the voyage from that port was a

stranger to the parties. He was appointed by the plaintiffs' correspondents, being well recommended by the master of the ship Comet of New York, of which he was chief mate. The news of the stranding was first learned by the plaintiffs on the 8th of January, by a letter from the master, which was communicated to the defendants, and on the same day an abandonment was tendered to them and by them refused.

No notice was given to the defendants of the schooner's bearing away for Charleston, nor any demand made for the general average loss thereby sustained, until the 9th of March; and the papers then communicated were the bills of expenses at Charleston, and the survey and protest. The action was brought on the 16th of April.

The plaintiffs claimed to recover for two distinct losses, a general average loss at Charleston, and a total loss by the stranding at the Washwoods.

The defendants resisted the claim for the loss at Charleston on two grounds ; first, that there was no count in the declaration which could embrace this loss ; and, secondly, that the company were not liable to be sued for it until sixty days after notice and an adjustment of it, the words of the policy being, " And in case of loss, &c. such loss shall be paid in sixty days after proof and adjustment thereof." The judge however overruled the objections, reserving them as questions of law ; and the jury found a verdict for the plaintiffs for this claim.

The defendants resisted the claim for a total loss on two grounds : —

First, that the vessel was intentionally and fraudulently stranded by the master. But the jury found that she was stranded and totally lost without fraud or fault to be imputed to him.

Secondly, that the cargo being landed on the beach with trifling damage, if any, and in a condition to be transported to Castine, its port of destination, it was the duty of the master thus to send it on, (and not to sell it,) if he could effect it at an expense short of one half of its value.

The cost of the cargo at Havana (including the six chests of tea, which were a part of the outward cargo) was 12,512

Bryant
v.
Commonwealth Ins.
Co.

dollars ; and deducting 660 dollars, the net proceeds of 40 bags of coffee sold at Charleston, the balance is 11,852 dollars. The gross amount of the sales of the coffee, sugar and tea at the Washwoods, was 11,544 dollars ; from which deduct 5,390 dollars (paid for duties) and there will remain 6,154 dollars ; but deduct 577 dollars, commissions of 5 per cent. on the sales, and 300 dollars, the estimated expense of saving the property, (amounting together to 877 dollars,) and there will remain 5,277 dollars.

The defendants introduced evidence tending to prove, that it was in the power of the master to take on his cargo to the port of destination in four different ways. 1. By getting the schooner off and putting the cargo on board. 2. By procuring another vessel to proceed to the Washwoods and take the cargo on board. 3. By transporting the cargo by land to Norfolk, and thence shipping it to Castine. And 4. by transporting it to the North Landing or some place on the waters of Currituck Inlet, and thence shipping it to Castine. The jury did not find which of these modes was most practicable, but they found generally that it would have cost 3,859 dollars to transport the cargo from the place of stranding to Castine, exclusive of any deduction or discount of the freight for the original voyage.

In regard to the vessel, the master caused no survey to be made, consulted no one about the practicability of getting her off, made no attempt to that effect, nor manifested a disposition to make any. The same remarks are applicable as to any attempt or disposition to transship or otherwise transport the cargo to its port of destination.

On the part of the plaintiffs it was insisted, that there was a usage to sell on the spot, goods cast on that shore, of whatever description, and particularly groceries, and that by this usage and the situation of the property at that season of the year, and under the circumstances in which the master was placed, he was authorized to sell on the beach for the benefit of all concerned. Evidence was introduced on both sides in regard to this usage, but there was no testimony that it was known to the parties, or to underwriters, merchants or navigators at Boston, at the date of the policy. The jury were in

134

struc ted, that if they found the usage would authorize the master to sell under the circumstances proved, they might return a verdict for the plaintiffs as for a total loss, the point being reserved, under the defendant's objections to it, as a question of law.    The jury found that the usage did authorize the sale, and returned a verdict for a total loss in cargo and freight.

The evidence respecting the usage and the expense of transporting the cargo from the Washwoods to Castine, was contained in depositions to be referred to by the Court.

If the Court should be of opinion that the verdict, either for a partial or a total loss, was against the evidence, a new trial was to be granted.    If they should be of opinion, that independent of the usage, the facts found by the jury proved only a partial loss, a new trial was to be had, or a judgment rendered for a partial loss, as the Court might order ; unless they should be of opinion that the usage was sufficiently proved and was valid, so as to authorize the master to sell the cargo and thereby constitute a claim against the defendants for a total loss.

In regard to the general average expenses at Charleston, judgment was to be rendered for the amount to be settled by the respective counsel, unless one or both of the points of law reserved on this head should be decided in favor of the defendants, or unless a previous average loss from expenses paid out of the property insured, should be considered as merged in a subsequent loss.

*Prescott* and *Orne*, for the defendants.    As the declaration contains but one count, the object of which appears to be to claim for a total loss, the plaintiffs cannot recover for the general average loss.    Where distinct losses are claimed, there ought to be a distinct count for each.

The defendants were not liable to an action for the general average loss, until sixty days after " proof and adjustment thereof."    The meaning of *adjustment* may not have been judicially determined, but we think it implies that the insurers should be furnished with all the documents necessary to enable them to settle the loss.    At least they should receive a statement of all the interests liable to contribute.

The principal question is, whether there was a total loss.

Bryant
*v.*
Common
wealth Ins.
Co.

135

*March* 10*th*

The cost of the cargo, deducting the cost of the 40 bags of coffee which were sold at Charleston, was more than 11,60C dollars, and the.jury have found that the cost of transporting it from the Washwoods to Castine would have been 3,859 dollars. The verdict is against the evidence in finding the expense so great, but even this expense would not justify an abandonment, as it does not amount to 50 per cent. on the invoice value of the goods. Further, as the expense of transportation from the intermediate place would have exceeded the amount of the freight from Havana to Castine, the goods would not have been liable for the original freight. *Searle* v. *Scovell*, 4 Johns. Ch. R. 218. The plaintiffs may contend that the amount of the sales on the beach is to be considered as the value of the cargo ; but that cannot be the criterion, for a vessel may be stranded where there is no market for the goods. The value before the accident must be taken, as that was the interest at risk. *Marcardier* v. *Chesapeake Ins. Co.* 8 Cranch, 49 ; *Ludlow* v. *Columbian Ins. Co.* 1 Johns. R. 335. In ascertaining whether there was a loss to the amount of 50 per cent., the commissions of the wreck master should be rejected, as that expense would have been avoided, if the cargo had been carried to Castine. On the day of the abandonment the loss was but partial, and if it became total, it was in consequence of a subsequent sale. But the master was not authorized to make the sale, either by law or usage. Not by law, for there was no necessity for selling. The cargo was not perishable, after it was landed, and might have been transported without any hazard to Norfolk. The master might have procured the funds necessary for that purpose, either by pledging or selling a part of the cargo. *Murray* v. *Hatch*, 6 Mass. R. 476 ; *Underwood* v. *Robertson*, 4 Campb. 138. And as to the supposed custom, if it was binding, it must be as a usage known and notorious, so as to have entered into the contract, — or as a local law, because the property went within the jurisdiction of Virginia. There was no evidence that such a usage was known here, so that it could not have entered into the contract, and as a local law it would affect only contracts made in Virginia, or with reference to the laws of that State. *Power* v. *Whitmore*, 4 Maule & Selw. 141 ;

*Smith* v. *Wright*, 1 Caines's R. 45 ; *Lewis* v. *Thatcher*, 15 Mass. R. 431. But a usage like the one in question could never have a lawful origin. A sale for the first time, under like circumstances, being unnecessary, would be a violation of the master's duty, and a repetition of such violations could not make them legal. The authority of the master to sell, whether derived from law or usage, can be exercised only where he has no opportunity to consult the owners. *Cocksedge* v. *Fanshaw*, 1 Doug. 132 ; *Tremenhere* v. *Pasco*, 3 Keb. 91 ; Vin. *Customs*, *H* 17 ; *Homer* v. *Dorr*, 10 Mass. R. 26 ; 1 Johns. R. 335 ; Condy's Marsh. 270, 707 ; Phillips on Ins. 14 *et seq.* ; *The Gratitudine*, 3 Rob. Adm. R. 240 ; *Milles* v. *Fletcher*, 1. Doug. 231 ; *Bell* v. *Nixon*, 1 Holt's N. P. Rep. 423 ; *Read* v. *Bonham*, 3 Brod. & Bing. 147 ; *Thorneley* v. *Hebson*, 2 Barn. & Ald. 513 ; *Wilson* v. *Millar*, 2 Stark. R. 1 ; *Hayman* v. *Molton*, 5 Esp. R. 65 ; 1 Emerig. 427, c. 12, § 16 ; *Gordon* v. *Mass. F. & M. Ins. Co.* 2 Pick. 262. But if the Court should think a custom would authorize the sale, the finding of the jury that there was a custom was not warranted by the evidence.

The counsel also contended, that the plaintiffs could not recover for a total loss, for that it was proved that the cargo might have been transported to its place of destination in either of the four ways mentioned in the statement of the case, and for a sum less than half the value of the goods.

*Shaw* and *Hubbard*, for the plaintiffs. The declaration, though containing but one count, is sufficient. It sets forth one entire contract to indemnify against all losses, and states the two losses which have actually happened, with a general claim of damages. It may be compared to a count upon a promissory note payable by instalments, where all the instalments have become due.

If the claim for a total loss more than sixty days before bringing the action, is not to be considered as including the general average loss, the consequence will be merely, that the latter must be made the subject of a new action.

Had the plaintiffs a right to abandon on the 8th of January . This must depend upon the facts existing at the time. The Washwoods is a small village containing sixty or seventy

Bryant
*v.*
Common-
wealth Ins.
Co.


137

12 *

houses. It is about forty miles from Norfolk by land, and sixty by water. The stranding was in the winter, at a place where there was no shelter for the cargo, nor any means of making one; and the cargo, consisting of coffee, sugar and tea, was liable to be injured by exposure to the weather. The master was at a great distance from the owners, and was obliged to govern his conduct by the immediate circumstances. The abandonment was made as soon as the owners heard of the loss. The defendants do not deny, that wheie the gotds are injured 50 per cent, the assured may abandon; but there are other reasons which will authorize an abandonment. If the adventure is put in so great hazard as to make it not worth pursuing, which was the case here, that is a sufficient reason, independent of any damage to the property. But the assured cannot abandon on account of the mere retardation of the voyage. *Goss* v. *Withers*, 2 Burr. 6 J3; *Milles* v. *Fletcher*, 1 Doug. 231; *Hamilton* v. *Mendes*, 2 Burr. 1198 and 1 W. Bl. 276; *Manning* v. *Newnham*, Park on Ins. (3d ed.) 168; *Anderson* v. *Wallis*, 2 Maule & Selw. 240; *Barker* v *Blakes*, 9 East, 283; *Mitchell* v. *Edie*, 1 T. R. 615; Phillips on Ins. 412 *et seq.*; *Gernon* v. *Roy. Exch. Ass. Co.* 1 Holt, 49, 2 Marshall, 92, and 6 Taunt. 383; *Hudson* v. *Harrison*, 3 Brod. & Bing. 105. Where the deterioration ot the goods is the only ground of abandonment, it is immaterial at what rate they are valued; but where other circumstances are joined, the rate becomes material. We contend that the value in the present case is the amount of the sales, and that the loss sustained was more than half that value. The circumstance of its being feasible or not, to get the vessel off, is of importance in ascertaining the right to abandon. It was well proved, that it was not advisable to attempt to get off this schooner, at least in the winter season. Neither was it practicable to send another vessel, at that season, to the place of stranding, to take the goods on board. The master was not bound to look beyond the place of distress or a contiguous port, for another vessel. *Saltus* v. *Ocean Ins. Co.* 12 Johns. R. 107; *Whitney* v. *N. Y. Firemen Ins. Co.* 18 Johns. R. 208; *Treadwell* v. *Union Ins. Co.* 6 Cowen, 270. It was not expedient to transport the goods to some place on Curri

Inlet, which is in another collection district. They could not have been carried there without giving bonds for the duties, as otherwise they would be liable to forfeiture, and the law will not oblige the master to give bonds. There was no alternative then but to transport them to Norfolk by land, or sell them on the beach. The master was not bound thus to remove them to Norfolk and incur the certain and probable expenses of such removal. The different estimates of different witnesses as to the value of the goods and the expense of transporting them, show the difficulties under which he labored. It was not in his power to make a better estimate than the Norfolk merchants who have testified in the case. He had no funds to pay the expenses of transportation. It is said that he might have obtained funds by pledging the goods ; but if he could not sell, he could not pledge. And if the goods had been taken to Norfolk, the duties must have been secured, and a commission have been paid to the bondsmen, or money to pay the duties must have been raised by a sale. Securing or paying the duties at Norfolk would have made that the port of discharge, and so the plaintiffs would have been obliged to get a new policy to cover the transportation from that port to Castine.

In regard to the usage, the presumption is that the insurer is acquainted with the course of business, and that he acquiesces in it, unless he expresses his dissent ; that he agrees, if the cargo is cast on shore where there are commissioners of wrecks, it shall be disposed of in the usual manner. It is objected to this, that here were means of carrying on the cargo ; but the like means have existed when other goods have been cast ashore at this place, and the usage to sell is evidence that the master adopted the course most beneficial for all concerned. *Palmer* v. *Blackburn*, 1 Bing. 61 ; *Stewart* v. *Bell*, 5 Barn. & Ald. 238.

Whether the loss by the fraud of the master is to be borne by the plaintiffs or the defendants, depends on the question whether the abandonment was valid ; as from the time of an abandonment the master becomes the agent of the underwriter. *Lee* v. *Boardman*, 3 Mass. R. 247 ; *Mitchell* v. *Edie*, 1 T. R. 608.

Bryant
*v.*
Common-
wealth Ins.
Co.

*Orne* in reply. The want of funds to transport the cargo cannot be set up by the plaintiffs as a ground of abandonment, since the master made no attempt to raise money for that purpose ; but having the cargo under his control, he might easily have obtained the sum requisite. He was bound to make all reasonable exertions to transport the cargo to Norfolk ; and if he had carried it there, which he might have done for 2000 dollars, there would have been no cause for an abandonment. A sale there would have produced from 40 to 70 per cent more than the sale on the beach. It is not decided in any case, that a master is not obliged to have recourse to land carriage, and courts would hesitate before they should adopt such a principle. There can hardly be an instance of stranding where some land carriage will not be required. It is objected that the master would have been obliged to bond the goods, if he had carried them to Norfolk. He did not consult with the collector on that subject ; if he had, it cannot be supposed that there would have been any difficulty in making an arrangement. Entering the goods at Norfolk would not have made it a " port of discharge," within the meaning of the policy. The authorities respecting abandonment for a loss of the voyage, have no bearing on this case, as here the adventure was manifestly worth pursuing.

*March 29th.* PUTNAM J. delivered the opinion of the Court. The principal question in this case is, whether, upon the facts proved, the verdict for a total loss can be supported.

It is found that the schooner was cast on shore by stress of weather, and without any fraudulent intent of the master, on the 28th of December, 1824, at a place in Virginia called the Washwoods. The vessel was not bilged, and the cargo sustained little or no damage by the stranding. The plaintiffs received a letter from the master on the 8th of January, 1825, giving information of this loss, and on that day they offered to abandon. The facts and circumstances attending the property at that time, must determine the rights of the parties as to making an abandonment. The cargo was not damaged, but the plaintiffs claim for a total loss on the ground that the voyage was lost by reason of the stranding of the vessel ; and that the master was authorized, from the necessity of the case,

to sell the cargo on the beach, and thus to put an end to the voyage. The defendants contend that this proceeding of the master was not warranted. They contend that the schooner might have been got off and the voyage completed with her, and that the cargo might by other means have been carried to the port of destination. In point of fact it was carried by land to Norfolk, by the purchasers, and it is proved that vessels might have been procured there to carry it to Castine.

Whether the schooner could have been got off or not, or whether another vessel could have been procured and brought to the Washwoods to receive and transport the cargo to Castine, or whether it could or could not have been carried by land to the North Landing, and from thence shipped in another vessel for Castine, is left doubtful upon the evidence, and is not settled by the jury. They only state the amount of the expense of completing the voyage, but do not give the items, nor state in which mode the voyage could have been best accomplished.

The law authorizes the master, in cases of shipwreck, stranding or other disasters which may happen without his fault, in the course of the voyage, to act for all parties interested, in their absence. If the ship should be stranded, it would be his duty, in behalf of the owner of the ship, to get her off and prosecute the voyage, if it could be done at an expense not exceeding half her value. So, if that could not be done, he has authority to procure another ship to carry the cargo to the port of destination. If the cargo were damaged by the stranding not exceeding one half the invoice value, it would be the duty of the master, as representing the owner of it, to cause it to be reladen on board the ship, if that were in a condition to transport it, or if not, on board any other ship which he could procure upon reasonable terms, on account of the ship-owner, to the end that the ship-owner may earn his freight, and the merchant have his goods at the port of destination. [1] The master, in short, is, in such cases of disaster, to act reasonably and honestly, with a view to save the prop-

---

[1] See *Hunt* v. *Royal Exch. Ass. Co.* 5 Maule & Selw. 47 ; 2 Phillips on Ins. 303 304.

erty and to perform the voyage. *Schieffelin* v. *N. Y. Ins. Co.* 9 Johns. R. 21, and cases there cited.

These general principles are not supposed to be controverted. If it should be admitted that the ship could not have been got off, and that there was no other mode of performing the voyage than by transporting the cargo to Norfolk and shipping it from thence to Castine, and that the cost would amount to the sum (3,859 dollars) which the jury have fixed, the question would recur, if that state of things authorized the master to break up the voyage by a forced sale.

The whole cargo (deducting the 40 bags of coffee which were disposed of at Charleston to pay for the general average loss) amounted to 11,851 dollars. It has been contended for the plaintiffs, that duties were payable at the port of the district where the stranding happened, and that the master was not obliged to give his bond to pay them. There are some authorities which decide that duties are not to be paid upon goods which are wrecked, but only on such as are voluntarily imported and landed. *Peisch et al.* v. *Ware et al.* 4 Cranch, 355. But if duties were demandable at Norfolk, the master, it must be supposed, might have raised the money by pledging the goods ; or he might have stored the goods (which were sound and not in a perishable state) and waited until he could have received funds from his owners at Boston. He could communicate with them by the mail in eight or ten days. If there were no other difficulty than the want of funds, it seems to us, that being so near his owners, he should have given them an opportunity to furnish them without a forced sale. It could make no material difference to the owners, whether the duties were paid or secured at the port of distress or at the port of destination. If they were paid at the former port, a certificate and permit would be granted for the exportation of the goods to the port of destination, and no duties would be required to be paid there. So in regard to the expense of transportation from the Washwoods to Norfolk, it is not to be supposed but that money could have been procured for that purpose without a sale of the whole cargo. If the stranding had been in a foreign country, where no facilities of transportation could be procured, and no credit obtained, and ready

money should have been required for all the scanty aid that could be obtained, it would present a very different case. But this disaster happened within forty miles of one of the most convenient ports in the United States, where there are respectable mercantile houses, who would without doubt gladly have taken charge of this property and made the necessary advances, for the usual commissions, and the cargo could have been speedily transported thither by land.

But it has been contended for the defendants, that the master was not bound to transport the cargo so great a distance by land ; and on the authority of the cases in New York, that he is not obliged to go beyond the port of distress, or a port contiguous or near at hand. It happens that Norfolk is in the same district in which the goods were landed. We do not however rely upon that point. It seems to us very difficult to lay down any geographical rule which could have a general application. And in the cases where the operations of the master have been so limited in New York, there were other circumstances which would have justified the conduct of the master in breaking up the voyage. Thus in *Saltus et al.* v. *Ocean Ins. Co.* 12 Johns. R. 107, the bulk of the cargo consisted of hemp, which could not be taken out in bales, and the rebinding and restowing it in another ship would have been equal to its value. And besides, there were no machinery and screws to compress it ; so that it would have required three or four vessels to carry on the hemp from Kinsale (the port of distress) to New York. These circumstances would fully have justified the master in not hiring several vessels, which might have been procured at Cork (which was sixteen miles from Kinsale), to carry the cargo to New York.

So in *Treadwell* v. *Union Ins. Co.* 6 Cowen, 270, where the ship was disabled and no ship could be obtained in port, *Woodworth* J. says, if there be a vessel in the same or a contiguous port, the duty of the master to procure it to carry on the cargo, is clear ; the rule is imperative. But if resort must be had to distant places, and, independently of procuring a vessel, *there are further serious impediments in the way of putting the cargo on board*, the rule is not obligatory.

After all, it becomes a question of reasonable care and con-

duct ,in the part of the master, and like other questions of that nature, after the facts are found, the law arising from them will be pronounced by the Court. [1]

It may happen that a vessel might be procured at a port in another State, and not geographically contiguous to the port of distress, in convenient time and upon more reasonable terms, than one could be had in the port of distress. We should not therefore be disposed to limit the operation of the master to any particular port or place, in regard to procuring another vessel ; but to require him to do so, if upon the whole it should seem reasonable, taking into view the nature of the voyage and the time, expense and risk of the transportation to the port of destination.

But it has been said that no case has been produced where the master has transported the cargo forty miles to re-ship it The testimony on the part of the plaintiffs proves that cargoes have been transported to Norfolk from the Washwoods, without having been sold there. Peter Lane mentions one instance of the transportation of a cargo of rum and sugar. William Lyford states another, of a cargo of cotton carried by land to Norfolk, where the consignee resided. Some transportation by land is necessary to reload the goods which have been cast on shore. It may happen that the transportation by land forty miles to a convenient port, might be more safe and expedient, than a transportation for a less distance to an open roadstead, for the purpose of re-shipping the cargo. Suppose, in the first case, that there were a good road and convenient baggage wagons from the place where the stranding was, to the ship which had been procured, lying at a convenient wharf, and that there were great impediments in the way from the place where the goods lay, to the shore ; and great difficulties in transporting from the shore in open boats to a ship beating in open and dangerous sea. It would be evident, that there would be a saving of time and expense, and there would be more safety, in the former than in the latter mode of re-shipment.

---

[1] See *Bryant* v. *Commonwealth Ins. Co.* 13 Pick. 549 *et seq.* ; 2 Phillips on Ins 376, 377 ; *Eagle Bank* v. *Chapin*, 3 Pick. (2nd ed.) 183, note 4 ; 1 Stark. Ev. (5th Am. ed.) 447 to 462.

If there were sufficient evidence to satisfy the jury, that the ship was stranded without the fault or fraud of the master, his conduct after the stranding will not admit of a conclusion so favorable. The evidence proves that he did not act in good faith and for the interest of all concerned. After the disaster he seems to have had no object but to raise as much money as he could, and as soon as he could, and for his own use, by a forced sale. He went to Norfolk, where he might have procured another vessel for a reasonable freight, to carry the cargo from thence to Castine. But he made no attempt to do it, and discovered no disposition (as the report finds) to transship or otherwise transport the cargo to its place of destination. If the cargo had been destined for Norfolk, could it be seriously contended that a total loss had happened ? And the freight from Norfolk to Castine would have been so small as to make no difference between the two places as ports of destination. It is obvious that no reasonable and honest man would have conducted himself as this master has done. He gave a false account of the situation of the property to his owners, which was received by them three days before the time of sale ; when it is evident that he should not only have given them a true account, but also, as he might by postponing the sale for a few days, have given them an opportunity to be present, if they should have thought it expedient, or to furnish pecuniary or other necessary aid, to prevent the enormous sacrifice of their property. It appears that the purchasers cleared from 40 to 70 per cent. in about one month.

But the plaintiffs relied much, at the trial, upon a usage to sell property on the beach in similar circumstances ; and the jury have found that there was such a usage. We cannot think that such a usage was of any validity. We have seen that it was not uniform. Some cargoes have been carried to Norfolk, and not sold on the beach. It could not have any lawful commencement or continuance, in any case where there was no necessity to make the sale. It was against common faith and honesty. Necessity only will authorize the sale. A usage to sell without necessity would be void.[1] It would be

*Bryant v. Common- wealth Ins. Co.*

145

---

[1] See 2 Phillips on Ins. 25 ; *Palmer v. Blackburne*, 1 Bingh. 61.

of no more validity, than would be a usage for the master and people to turn pirates when the vessel should take the ground. So far as it could be proved, that property, situated in all re- spects as this was, had been disposed of for the benefit of all concerned, on the spot, so far, and no farther, it would be evidence tending to satisfy the jury that the sale was reasonable and necessary. So that it comes to the question, after all, whether or not the master was justified by the circumstances and the necessity of the case, to make the sale as he did.[1] Upon that question we have all a strong opinion, that it was not reasonable or necessary.

But there was not sufficient evidence to warrant the jury in fixing so great a sum as the expense of transportation. Let us attend to some of the facts which were proved without any doubt. The cargo consisted of coffee in bags, sugar in boxes, and tea in chests. It was landed in a sound condition on the 29th and 30th of December, and sold on the 11th of January following on the beach. The master went immediately after the disaster to Norfolk, and entered the cargo, and made arrangements for selling it, but none for its transportation to the port of destination. It is proved that the purchasers of the cargo carried it by land from the beach to Norfolk *in two days*, in a perfectly sound condition, notwithstanding a storm happened while the carts and wagons were on their way. The property was covered in such manner as that it was not damaged in the least by the storm. The expense of transportation amounted to less than 1600 dollars ; which was nearly twice as much as would have been required in ordinary cases, the carmen taking advantage of an approaching storm, to insist upon an unusual compensation. These facts are proved by the merchants who bought the cargo. It is also proved, that vessels might have been procured at Norfolk for three or four dollars per ton to transport the cargo to Castine. The amount of the transportation thither would probably not have exceeded 2000 dollars, with all the impositions of the carmen. But the

[1] See *Gordon* v. *Mass. F. & M. Ins. Co.* 2 Pick. (2nd ed.) 262, note 1 ; 267, note 1, and cases there cited ; *Hall* v. *Franklin Ins. Co* 9 Pick. 466 ; 3 Kent s Comm. (3d ed.) 173 to 175 ; *Gardner* v. *Salvador* 1 Moody & Rob 116 *Bryant* v. *Commonwealth Ins. Co.* 13 Pick. 543.

cargo remained twelve or thirteen days on the beach in fine weather. In half that time, with ordinary diligence, it might have been carried to Norfolk and laden on board another vessel, and by the time that it was sold upon the beach, it might have been delivered safe and sound at the port of destination, at an expense probably not exceeding one sixth part of the value. The burden is clearly upon those for whom the master was agent under such circumstances, to prove that there was a necessity for breaking up the voyage. But the facts which are proved would not have warranted that conclusion, even if the expense of transporting the cargo to the port of destination had been as great as the jury have stated it. The loss then would have been much less than 50 per cent; which is the general rule applicable to the cargo as well as to the ship.

The loss must fall upon the party whose agent the master became under the circumstances. If there had been a necessity for the sale, the law would have constituted him the agent for the underwriters.[1] As there was not, the loss must fall upon the owners. It is clear from the evidence, that the voyage was worth pursuing, and that the master might, by reasonable care and conduct, have performed it in such manner as that the owners would have sustained only a partial loss. The law will not allow them, under such circumstances, to recover for a total loss.

Some technical objections have been made to the form of the declaration and proof. It is said for the defendants, that the plaintiffs declare in one count for a general average loss which happened at Charleston, and for a total loss afterwards by the perils of the seas, and that such a joinder of separate causes of action cannot be maintained. We do not think that the objection is of validity. The plaintiffs may well declare thus specially upon their whole case, and recover damages according to the proof.

But it is further objected, that by the terms of the policy, the defendants were to have notice of any average loss, sixty days before they should be liable to pay it, and that this action was commenced within sixty days of the notice of the average

Bryant
*v.*
Common-
wealth Ins.
Co.

147

---

[1] See 2 Phillips on Ins. 326 to 328.

Bryant
v.
Common-
wealth Ins.
Co.

loss. And this objection, so far as it regards the average loss, is a good defence. The defendants might have paid that loss within sixty days, and have prevented any litigation as to that part of the case. No recovery can be had in this action for that loss. But there was a seasonable notice of the stranding at the Washwoods, and a demand sufficient to enable the plaintiffs to recover for the damages occasioned by that disaster.[2]

The verdict of the jury, which was for a total loss, must be set aside and a new trial granted.[3]

---

[2] See 2 Phillips on Ins. 382, 383.

[3] See *Bryant* v. *Commonwealth Ins. Co.* 13 Pick. 543.